DA 11-0510

FILED

November 30 2012

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 272

HELENA SAND AND GRAVEL, INC.,
a Montana Corporation,

        Plaintiff and Appellant,

  v.

LEWIS AND CLARK COUNTY PLANNING
AND ZONING COMMISSION, and THE
LEWIS AND CLARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

        Defendants and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDV 08-581
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Michael S. Kakuk (argued); Kakuk Law Offices, P.C.; White Sulphur
                Springs, Montana

        For Appellees:

                Leo J. Gallagher, County Attorney; K. Paul Stahl (argued) and Jeff Sealey,
                Deputy County Attorneys; Helena, Montana

        For Amicus Curiae:

                Steven T. Wade, Morgan M. Weber; Browning, Kaleczyc, Berry &
                Hoven, P.C.; Helena, Montana (for the Montana Contractors Association)

                Argued and Submitted:  August 15, 2012

                                Decided:  November 30, 2012

Filed:

            _____
                         Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Helena Sand and Gravel, Inc. (HSG) appeals the First Judicial District Court's order denying its motion for summary judgment and granting summary judgment in favor of Lewis and Clark County Planning and Zoning Commission and Lewis and Clark County Board of Commissioners (collectively, "the County").

We address the following issues on appeal:

¶2 *1. Whether, in adopting the zoning pattern and regulations prohibiting mining in a special district, the County abused its discretion by failing to consider existing land uses or to ensure substantial compliance with the Lewis and Clark County Growth Policy (Growth Policy).*

¶3 *2. Whether the County's adoption of zoning regulations prohibiting sand and gravel mining constitutes illegal reverse spot zoning.*

¶4 *3. Whether HSG has an established property right, entitling it to bring a takings claim against the County.*

¶5 We affirm the District Court's decision as to the first two issues. We affirm in part and remand as to the third.

## PROCEDURAL AND FACTUAL BACKGROUND

¶6 The establishment of local zoning districts is governed by statute in Montana. A district may be created in one of two ways—by citizen petition to the board of county commissioners under § 76-2-101, MCA, known as "Part 1 zoning," or directly by the board of county commissioners under § 76-2-201, MCA, known as "Part 2 zoning." This case involves Part 1 zoning. HSG challenges the County's decision to adopt a citizen-

2

initiated proposal to configure a zoning district that favors residential uses and prohibits mining.

¶7 HSG owns approximately 421 acres located north of East Helena, Montana. In June 2008, HSG obtained a permit from the Montana Department of Environmental Quality (DEQ) to mine gravel on 110 acres of its property. Those 110 acres are not at issue in this case. Before DEQ granted the permit, a group of citizens living north of East Helena submitted to the County a petition seeking to create Special Zoning District Number 43 (District 43). The proposal delineated an area which encompassed the property owned by HSG and its purpose was: "to accommodate and protect the use of single-family dwelling units and associated agricultural land uses while promoting and preserving the rural residential atmosphere of the area and enhancing the aesthetic character and property values of the area." It proposed to prohibit industrial and mining activities in the district, including any sand and gravel operations to be performed by HSG on the remaining 311 acres of its property. The petition was signed by approximately seventy percent of the property owners within the proposed district.

¶8 The statutory provisions for Part 1 zoning authorize the board of county commissioners, "whenever the public interest or convenience may require," to create a planning and zoning district "upon petition of 60% of the affected freeholders," unless

3

"50% of the titled property ownership in the district protest the establishment of the district within 30 days of its creation." Section 76-2-101, MCA (2007).[1]

¶9 On April 1, 2008, following a public meeting, the Lewis and Clark County Board of Commissioners (the Board) voted to create District 43. HSG commented during the meeting that the petition constituted "illegal gerrymandering" because "[t]he district borders have been specifically and unreasonably drafted to benefit the petitioners"; no protest, however, was filed by fifty percent of the land owners within thirty days of the Board's approval of the district. Thus, on May 8, 2008, the Board adopted a resolution creating the boundaries of District 43.

¶10 The matter proceeded to the Lewis and Clark County Planning and Zoning Commission (the PZ Commission), which is statutorily required to adopt a development pattern for the new district and authorized to recommend regulations to the Board to implement the development pattern. Sections 76-2-104 and -107, MCA. On June 4, 2008, the PZ Commission held a hearing in which it solicited public comments regarding the development pattern and regulations proposed by the petitioners. HSG reiterated the concerns it had raised at the earlier meeting and submitted a proposal recommending that sand and gravel mining operations be authorized within the district under a conditional use permit. In order to provide the county attorney's office with additional time to analyze the legal issues raised by HSG, the PZ Commission continued the hearing.

---

[1] The 2007 version of the statute applied at the time that the petitioners submitted their proposal in February 2008. Unless otherwise indicated, all statutory references are to the 2007 Montana Code Annotated.

¶11 On June 11, 2008, the county attorney's office informed the PZ Commission that it needed additional evidence on two issues—(1) whether the proposed development pattern and regulation complied with the Growth Policy, and (2) how the proposed zoning compared with existing uses surrounding and within the district. The PZ Commission directed planning staff to create a report on the two issues.

¶12 The staff report, prepared on June 18, 2008, described the broader transitional area in which District 43 is located as being "characterized by a range of residential and rural residential development," though it noted the existence of two operational gravel mines in the area. The report was made available to the public and, on June 30, 2008, the PZ Commission reopened its June 4 hearing in order to discuss the report's findings. The Commission received numerous public comments, including comments from HSG. The PZ Commission met on July 1, 2008, to consider the development pattern and regulations for District 43. In discussing the public input they had received, the Commissioners stated that it was a "difficult decision." The regulations were adopted and referred to the Board for approval. The Board held a public meeting on July 3, 2008, during which it again received comments from HSG and other members of the public. The Board then tabled the matter for a week and, on July 10, 2008, approved the regulations.

¶13 In July 2008, HSG filed a complaint in the First Judicial District Court, alleging that the County had adopted a zoning pattern and regulations that improperly prohibited HSG from mining sand and gravel on its property. The District Court considered cross-motions for summary judgment on whether the County had improperly adopted the

zoning pattern and regulations creating District 43, and whether the County's zoning decision constituted a taking of HSG's property. The District Court entered summary judgment in favor of the County on both issues. It reasoned that the zoning regulations substantially complied with the growth policy and that they did not single out HSG for disparate treatment because "the County's prohibition on sand and gravel operations applies to all of the land within [District 43], not only to the property owned by HSG." The District Court also concluded that HSG did not have an established property right in its ability to apply for a mining permit because "DEQ does not lack 'all discretion'" in granting and denying such permits and thus "approval of the permit is not 'virtually assured.'"

## STANDARD OF REVIEW

¶14 We review *de novo* the district court's decision on motions for summary judgment, applying the same Mont. R. Civ. P. 56(c) criteria as the district court. *Ternes v. State Farm Fire & Cas. Co.*, 2011 MT 156, ¶ 18, 361 Mont. 129, 257 P.3d 352. Summary judgment is appropriate when, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Ternes*, ¶ 18.

¶15 When reviewing a zoning decision, we "give deference to the decisions of the local board." *Town & Country Foods, Inc. v. City of Bozeman*, 2009 MT 72, ¶ 14, 349 Mont. 453, 203 P.3d 1283. Our review is limited to the question whether the zoning authority abused its discretion. *Town & Country Foods*, ¶ 13. To constitute an abuse of

6

discretion, the zoning authority's decision must be based on information that is "so lacking in fact and foundation that it is clearly unreasonable." *Town & Country Foods*, ¶ 13 (citing *Flathead Citizens for Quality Growth, Inc. v. Flathead County Bd. of Adjustment*, 2008 MT 1, ¶ 32, 341 Mont. 1, 175 P.3d 282). If the validity of the legislative classification for zoning purposes is "fairly debatable," then the legislative judgment of the zoning board controls. *Mack T. Anderson Ins. Agency v. City of Belgrade*, 246 Mont. 112, 120, 803 P.2d 648, 652 (1990) (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387-88, 47 S. Ct. 114, 118 (1926)).

## DISCUSSION

¶16    *1. Whether, in adopting the zoning pattern and regulations prohibiting mining in a special district, the County abused its discretion by failing to consider existing land uses or to ensure substantial compliance with the Growth Policy.*

¶17    Under § 76-1-605, MCA, zoning regulations adopted by a local governing body in an area covered by a growth policy must "be guided by and give consideration to the general policy and pattern of development set out in the growth policy . . . ." Section 76-1-605(1)(c), MCA. The statute also provides that "[a] growth policy is not a regulatory document" and "[a] governing body may not withhold, deny, or impose conditions on any land use approval or other authority to act based solely on compliance with a growth policy . . . ." Section 76-1-605(2)(a)-(b), MCA. In considering the degree to which zoning regulations adopted by the local authority must conform to the growth policy, we have held that the standard is "substantial compliance." *Little v. Bd. of Co. Comm'rs*, 193 Mont. 334, 353, 631 P.2d 1282, 1293 (1981) (determining whether a Part 2 zoning

7

decision was in substantial compliance with master plan); *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 74, 360 Mont. 207, 255 P.3d 80 (holding that, following the 2003 revisions to statutes governing growth policies and planning boards, "the 'substantial compliance' standard still applies"). We apply the substantial compliance standard to zoning regulations adopted under Part 2, as seen in *Little*, and also those adopted under Part 1. *See Bridger Canyon Property Owners' Ass'n v. Planning & Zoning Comm'n*, 270 Mont. 160, 170, 890 P.2d 1268, 1274 (1995) (stating that "the propositions established in *Little* are applicable" to Part 1 zoning).

¶18 HSG argues that the zoning regulations do not substantially comply with the Growth Policy because the zoning board "disregard[ed] the actual use of the land." HSG points out that the County's staff report, made at the PZ Commission's request, noted the existence of five gravel pits in and around the transitional area encompassing District 43. The County nonetheless classified the area as "rural residential." HSG thus contends that the County asked for, but did not "actually [use the] additional information in any meaningful way." It contends this case is comparable to *Ash Grove Cement Co. v. Jefferson County*, 283 Mont. 486, 943 P.2d 85 (1997), where we held that the zoning board had implemented regulations that conflicted with existing uses. The County maintains that, despite the existence and operation of multiple gravel pits in and around the area, the current land use is "primarily residential" and that *Ash Grove* is inapplicable.

¶19 We agree with the County that this case differs from *Ash Grove.* In that case, the Jefferson County Board of Commissioners had adopted a master plan for Jefferson

8

County that included the objective of inviting "continued mineral exploration, extraction and refinement" and classified the area surrounding Ash Grove's quarries and cement plant as "Mining: Active Surface" and "Mining and Industrial: Intensive Mineral Processing and Industrial Uses."[2] *Ash Grove*, 283 Mont. at 489-90, 943 P.2d at 87-88. The commissioners then adopted a citizen-initiated local vicinity plan that was intended to amend the master plan and to supersede it as to any inconsistencies. *Ash Grove*, 283 Mont. at 498, 943 P.2d at 93. The local plan contrasted starkly with the existing master plan—it described Ash Grove and its surroundings as having a "unique rural residential character" and failed to include existing mining and industrial uses. *Ash Grove*, 283 Mont. at 490-91, 943 P.2d at 88. We concluded that the local plan failed to substantially comply with the master plan and was not a proper amendment to the master plan because it "disregards the actual use of the land to which it purports to apply . . . ." *Ash Grove*, 283 Mont. at 499, 943 P.2d at 93.

¶20    In this case, the special zoning district does not purport to amend the Growth Policy, but—as permitted under Part 1 zoning—to create specific zoning requirements within the area already defined by the Growth Policy. The creation of District 43 is expressly contemplated by Montana law, unlike the local vicinity plans in *Ash Grove*, that were authorized by the master plan itself and failed to comply with Part 1 zoning requirements. *Ash Grove*, 283 Mont. at 489, 943 P.2d at 87. The relevant version of the

---

[2]  Planning documents formerly called "master plans," "comprehensive plans," or "comprehensive development plans" are now referred to as "growth policies." *See Little*, 193 Mont. at 349, 631 P.2d at 1291; *see also Lake Co. First v. Polson City Council*, 2009 MT 322, ¶ 17 n. 2, 352 Mont. 489, 218 P.3d 816 (citing § 76-1-106, MCA (2005)).

Lewis and Clark County Growth Policy was adopted in February 2004, four years before HSG obtained its mining permit from DEQ for the 110 acres. It states the following county-wide policy objectives, among others: "[s]upport the continuation of farming and ranching operations," "[e]ncourage in-fill development of urban and transitional areas already committed to development[,]" and "[p]rovide more predictability for property owners and the development community regarding appropriate changes in land use . . . ." The Growth Policy indicates that the Helena Valley Planning Area "is facing considerable growth and development pressure." Unlike Jefferson County's master plan, the Growth Policy seeks to strike a balance between agricultural and residential use; it does not mention mining and industrial uses as a priority for the Helena Valley, but suggests mining should be focused in the valley's rural areas.

¶21 The Growth Policy defines three "urban" areas, two "special use areas," and three "transitional areas," with the remaining lands of the Helena Valley designated as rural areas. HSG's property lies within one of the three "transitional areas," which the Growth Policy defines as containing "low-density development and community services (schools, parks, fire protection, neighborhood, commercial, etc.) and having the potential to "accommodate additional infill development." Specifically, HSG's property and District 43 are located within Transitional Area F (Area F), which the Growth Policy describes as:

> . . . characterized by a range of residential development (urban density, mobile home parks, ranchette density), a small commercial hub (Wylie Drive and Canyon Ferry Road), two gravel resource extraction operations, designated 100-year floodplains, and irrigation facilities. Portions of the

area are zoned for residential and ranchette uses, but a majority of the area is not zoned.

The county's staff report, prepared in June 2008, provided a similar description:

> Area F is generally characterized by a range of residential and rural residential development (including a few mobile home parks), a small commercial hub located at the junction of Wylie Drive and Canyon Ferry Road, two existing gravel resource extraction operations both located west of Wylie Drive, three fire stations serviced by either the Eastgate Rural Fire District or the East Helena Valley Fire District, two elementary schools . . . and two community parks . . . .  The Area is also comprised of various commercial and/or industrial uses that include, but are not limited to the following:  a number of storage unit operations, manufacturing businesses, automobile/boat storage, . . . day care center(s), a sign and graphic business(es), a meat packing and processing facility or facilities, and other various businesses and operations.

Other land uses noted in the report include two water treatment plants, agriculture, and churches.  Though the majority of Area F remains unzoned, as it was at the time of the 2004 Growth Policy, the report identified two special zoning districts in addition to District 43—LaCasa Grande, designated as residential, neighborhood commercial, and public lands and institutions, and T-L Ranch Acres, a "rural residential District that does not contain any specific zoning designations."  Regarding District 43, the report stated that "[t]he proposed development pattern/regulations are very similar to a combination of both La Casa Grande and T-L Ranch Acres."  These descriptions of Transitional Area F support the County's determination that the existing uses were primarily residential and that the proposed zoning pattern and regulations for District 43 did not conflict with such existing uses.

¶22   The County acknowledges that the existence of gravel pits in and around Area F made its decision a "closer call."  This is reflected in the Commissioners' statements during the PZ Commission's July 1, 2008 meeting.  In deciding whether to adopt finally the zoning pattern and recommend the proposed regulations to the Board, the Commissioners stated that they had "received a volume of compelling testimony from both sides" and that their decision was "difficult."  However, the balance tipped in favor of adopting the regulations.  Commissioner Hunthausen stated:

> [T]he growth policy indicates to me that gravel pits are most appropriate in rural areas and less appropriate in urban and transitional areas and especially this transitional area where the residential character of that area has pushed in and encroached[;] it's very much upon this portion of the transitional area.  So it seems to me if we were consistent with the growth policy that we would support this transitional area being kept in a residential type of growth pattern.

Commissioner Murray pointed out that, although the Growth Policy acknowledged that two gravel pits were present in Area F at the time the Growth Policy was adopted, this did not mean that gravel pits must be allowed in transitional areas, since "[m]ost if not all zoning districts have existing non-conforming uses in them."  *See* § 76-2-105, MCA (allowing continuation of existing non-conforming uses).

¶23   The County notes accurately that this Court may reverse its decision only where it is "so lacking in fact and foundation that it is clearly unreasonable."  *Town & Country Foods*, ¶ 13.  Having thoroughly reviewed the information upon which the County based its decision, we conclude that it considered existing uses in Area F and District 43 and its determination that the prevailing use was residential was not clearly unreasonable.

¶24 Additionally, HSG argues that the zoning district was designed by petitioners with the specific intent of preventing HSG from mining its property. Montana Contractors Association filed an *amicus* brief warning this Court of the dangers of such "blatant gerrymandering" and underscoring the negative economic impact that would result from the relocation of mining operations away from developing areas where demand for gravel is highest. HSG and *amici* contend that the petitioners deliberately drew the district boundary so that fifty percent of the property owners would not protest its establishment. The County agrees that "the citizens who petitioned for the creation of [District 43] initiated the process with the main purpose of stopping HSG from mining on its property," but maintains that the County "did not act with that same purpose." We agree with the County. Regardless of what motivated the petitioners to initiate the Part 1 zoning process, the record demonstrates that the County heard and considered public comments from both sides at all stages of its decision-making process. The Commissioners' own comments indicate that they were careful to make their decision based on compliance with the Growth Policy and the existing uses within the district, rather than based on HSG's proposed mine expansion.

¶25 During the PZ Commission's July 1 meeting, Deputy County Attorney Sealey advised the Commission that its decision was not to be "based on Helena Sand & Gravel's pit," but on "the growth policy and whether gravel pits generally belong in transitional areas and whether gravel pits belong in this particular transitional area [and] this particular district." Voting in favor of adopting the regulations, Commissioner

13

Hunthausen stated, "my decision is not about Helena Sand & Gravel. It's not about this particular gravel pit. It's about in general . . . is it consistent with the growth policy and is this the direction that we want to head as a county." Prior to adopting the zoning pattern, Commissioners made statements on the record expressing their preference for comprehensive zoning and acknowledging the need for gravel mining:

> Chairman Tinsley: This is a classic example of why we need comprehensive zoning. We need gravel to build our highways. We need gravel to do construction yet all of the gravel ground is covered by residential housing because there was no zoning. . . . This is a textbook case of why zoning is necessary and what we have been pushing and talking about as long as I've been a county commissioner. . . .

> Commissioner Hunthausen: . . . I would just echo what you said[,] that comprehensive zoning is the way to do this. This is probably not the most efficient and effective way to zone an area. . . . This is a difficult position [for] us to be put in[,] for a local business to be put in[,] and for residents to be put in. If we can plan our valley ahead of time and work to lay it out in a way that works for most of us most of the time[,] then I think we have a much better process and a way to go in the future.

¶26 HSG's complaint about "gerrymandering" relates more to the effects of Part 1 zoning than it does to the County's decision that the zoning district was acceptable in consideration of existing uses and the Growth Policy. HSG is not challenging the constitutionality of zoning by citizen petition. The consequences of Part 1 zoning decisions such as this one understandably are difficult for affected landowners. However, the Legislature expressly has authorized zoning by citizen petition and HSG acknowledges that "[t]his Court does not sit as a super-legislature or super-zoning board." *Town & Country Foods*, ¶ 14. The County followed the Part 1 requirements in adopting the zoning district. The Growth Policy and staff report prepared by the County

14

provided information upon which the County reasonably relied in determining that District 43 lies in an area that is characterized by residential development as the prevailing use. Even if this zoning classification was "fairly debatable," we must defer to the legislative judgment of the zoning board. *Mack T. Anderson Ins. Agency*, 246 Mont. at 120, 803 P.2d at 652. Thus, applying appropriate deference to the zoning authority, we cannot conclude that the County's decision to adopt the zoning pattern and regulations for District 43 was clearly unreasonable and an abuse of discretion. *Town & Country Foods*, ¶ 13.

¶27　*2. Whether the County's adoption of zoning regulations prohibiting sand and gravel mining constitutes illegal reverse spot zoning.*

¶28　HSG argues that the County's decision to adopt the zoning pattern and regulations proposed by the petitioners constituted illegal reverse spot zoning. HSG cites to federal precedent that defines reverse spot zoning as "a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 132, 98 S. Ct. 2646, 2663 (1978). While this Court "has never considered or adopted a 'reverse' spot zoning analysis" per se, we have considered spot zoning in a number of cases. *Liberty Cove, Inc. v. Missoula Co.*, 2009 MT 377, ¶ 24, 353 Mont. 286, 220 P.3d 617 (citing cases). Both parties reference our spot zoning analysis in their discussion of this issue, and we agree the precedents supply relevant authority. Both spot zoning and reverse spot zoning involve "the process of *singling out 'a small parcel of land'*" for differential use

15

classification. *Little*, 193 Mont. at 346-47, 631 P.2d at 1289 (emphasis in original); *Penn Central*, 438 U.S. at 132, 98 S. Ct. at 2663.

¶29 In determining whether a county has engaged in illegal spot zoning, we apply the three-part framework provided in *Little*. *See Plains Grains L.P. v. Bd. of Co. Comm'rs*, 2010 MT 155, ¶¶ 58-66, 357 Mont. 61, 238 P.3d 332 (applying the *Little* three-part test); *see also Greater Yellowstone Coalition v. Bd. of Co. Comm'rs*, 2001 MT 99, ¶¶ 21-37, 305 Mont. 232, 25 P.3d 168 (same). The *Little* framework requires evaluation of whether: (1) "the requested use is significantly different from the prevailing use in the area," (2) "the area in which the requested use is to apply is rather small," and (3) "the requested change is more in the nature of special legislation." *Little*, 193 Mont. at 346, 631 P.2d at 1289. We clarified that "[t]here is no single, comprehensive definition of spot zoning applicable to all fact situations," but "usually all three elements are present" when illegal spot zoning has occurred. *Little*, 193 Mont. at 346, 631 P.2d at 1289 (quoting Donald G. Hagman, *Urban Planning and Land Development Control Law* ch. 6 § 93, 169 (West 1971)).

¶30 HSG relies heavily on the second factor of the *Little* test because it is the only landowner shown to have been affected by the zoning in District 43. HSG is correct that the second *Little* test usually "focuses on the number of owners who stand to benefit from a zoning change." *See Greater Yellowstone Coalition*, ¶¶ 26-28 (recognizing that second test was met where only one landowner benefitted from rezone); *see also Little*, 193 Mont. at 347, 631 P.2d at 1289 (stating that "it is really a question of preferential

16

treatment for one or two persons as against the general public, regardless of the size of the tract involved") (citing *Thomas v. Town of Bedford*, 184 N.E.2d 285 (N.Y. 1962)). Here, even though—at over 400 acres—its parcel of land is not physically small, HSG has shown that it was the only landowner to be adversely affected by the zone change in creation of District 43.

¶31    As we previously have observed, however, "zone changes for property owned by one person are not *always* spot zoning pursuant to the *Little* test." *Greater Yellowstone Coalition*, ¶ 27.   In particular, we "reinforced" in *Little* that "'zoning has been held invalid as spot zoning when it is not in accordance with a comprehensive plan.   We cannot ignore this test when our zoning statutes place great weight on the comprehensive plan as a guide in zoning.'" *Liberty Cove*, ¶ 25 (quoting *Little*, 193 Mont. at 347, 631 P.2d at 1290).   Compliance with a comprehensive plan, or growth policy as in this case, is especially relevant to the third factor of the analysis. *Little*, 193 Mont. at 347, 631 P.2d at 1290).   The zoning is not "in the nature of special legislation" if it substantially complies with the growth policy.   HSG conceded the point during oral argument before this Court:

> The Court:  Mr. Kakuk . . . if the Court were to conclude that the district complies with the growth policy as a whole, does that then automatically answer the second issue raised in your brief, which is that it was reverse spot zoning?  In other words, if it complies with the growth policy or if we defer to the legislative judgment that it complied with the growth policy, your spot zoning claim fails.  Is that correct?

> Counsel: Well, I don't want to shoot myself in the foot, I'd like to say no, but I think you're right, ma'am.

This conclusion finds support in *Little*, which condemned the county's actions as "spot zoning of the worst kind" in part because the comprehensive plan recommended a different use of the affected property. *Little*, 193 Mont. at 345-46, 631 P.2d at 1289. In contrast, as discussed above, the Lewis and Clark County Growth Policy does not recommend development of mining in transitional areas, but suggests that such activity occur in the rural areas of the Helena Valley.

¶32   For similar reasons, HSG does not satisfy the first factor of the *Little* analysis. Again, we already have determined that in adopting zoning regulations prohibiting mining in District 43 the County did not unlawfully depart from the prevailing "rural residential" use in the surrounding area. Our decision that the zoning pattern and regulations substantially complied with the prevailing land use, as expressed in the Growth Policy and staff report, disposes of two out of the three *Little* factors. HSG therefore cannot demonstrate that its property was singled out for "a use classification totally different from that of the surrounding area," *Little*, 193 Mont. at 346-47, 631 P.2d at 1289, and thus subjected to illegal spot zoning.

¶33   Moreover, if we were to follow HSG's suggestion and apply the definition of reverse spot zoning used in *Penn Central*, HSG's claim likely also would fail under that analysis. *See Penn Central*, 438 U.S. at 132, 98 S. Ct. at 2663 (stating that reverse spot zoning is "the antithesis of land-use control as part of some comprehensive plan . . .").

18

¶34   *3. Whether HSG has an established property right, entitling it to bring a takings claim against the County.*

¶35   We engage in a two-step inquiry to determine whether government action amounts to a taking of private property—first, whether the plaintiff has a constitutionally protected property interest and second, whether the property owner has been deprived of that interest. *Seven Up Pete Venture v. State*, 2005 MT 146, ¶ 26, 327 Mont. 306, 114 P.3d 1009 (quoting *Kiely Constr., L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 23, 312 Mont. 52, 57 P.3d 836) ("[T]he guarantees of the Fifth and Fourteenth Amendments apply only when a constitutionally protected liberty interest or property interest is at stake.") (internal citation and quotation marks omitted).   On cross-motions for summary judgment, the parties agreed to limit the District Court's decision to the first step of the takings analysis—whether HSG has a constitutionally protected property interest. Accordingly, we limit our review to that threshold question.   Both in its summary judgment briefs before the District Court and in its briefs on appeal, HSG argued that it has constitutionally protected property interests arising from its alleged interest in the expansion of its mining permit and from the impact of the zoning regulations on the value of the real property on which the mining activity is proposed to occur.   Because the District Court concluded that HSG failed to show a protected entitlement to a mining permit, it did not consider separately HSG's ownership interest in the real property. Since HSG raises both interests on appeal, we will consider both aspects of HSG's claim.

¶36   First, in assessing whether a constitutionally protected property right inheres in an opportunity to apply for a permit, we "focus on the degree of discretion given the

19

decisionmaker and not on the probability of the decision's favorable outcome." *Kiely*, ¶ 29 (quoting *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1116 (10th Cir. 1991)). We recognize a property owner's constitutionally protected claim of entitlement to permit approval where "the local agency lacks *all* discretion to deny issuance of the permit or to withhold its approval." *Kiely*, ¶ 28 (emphasis in original) (quoting *Gardner v. Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992)). The issuing agency lacks all discretion when the permitting criteria under state and municipal law are "so narrowly circumscribed that approval of a [proper] application is virtually assured." *Kiely*, ¶ 28.

¶37    HSG argues that upon its submitting a proper application for a mining permit, DEQ is statutorily mandated to grant the permit. According to HSG, DEQ does not have the authority to deny an application; rather, it "must continue to notify the applicant of any deficiencies and then allow the applicant to correct the application until it is deemed complete." HSG points to the language in the permitting process outlined in § 82-4-432, MCA (2011).[3] That statute states, "[i]f the application is acceptable, the department *shall* issue a permit to the operator . . . ." Section 82-4-432(10)(c), MCA (emphasis added).

¶38    The language of the statutes makes clear that an applicant is not entitled to a permit unless the application is "complete" *and* DEQ determines that the application is "acceptable." Section 82-4-432(4)(b)(i), MCA (determination that an application is complete does not ensure that the application is acceptable). In addition to other

---

[3] Since the DEQ permitting process had yet to occur for the remaining 300-plus acres, we refer to the current version of the Montana Code Annotated in reference to that process.

20

requirements, "[a]n application is acceptable if it . . . includes a plan of operation that satisfies the requirements of 82-4-434 and rules adopted pursuant to this part related to 82-4-434." Section 82-4-432(10)(a), MCA. Section 82-4-434, MCA, also uses mandatory language; it provides that DEQ "may *not* accept a plan of operation *unless*" the plan meets the fourteen requirements listed in § 82-4-434(3)(a)-(n), MCA. Those requirements include, among others, the following qualitative determinations: "appropriate" protection of archaeological and historical values under subsection (h); reclamation as concurrently with the operation "as feasible" under subsection (k); "appropriate" surface and ground water protection under subsection (l); and minimized noise and visual impacts "to the degree practicable" under subsection (m). In addition, an acceptable application "must" include "a statement from the local governing body . . . that the proposed sand and gravel opencut operation complies with applicable zoning regulations . . . ." Section 82-4-432(2)(b), MCA.

¶39 Under these governing statutes, DEQ "shall issue a permit" *only if* it has determined that the operating plan complies with zoning regulations *and if* it also has decided that the operating plan meets the numerous qualitative requirements of § 82-4-434(3)(a)-(n), MCA. If DEQ determines that any of those qualitative factors is lacking, such as appropriate groundwater protection—a significant factor in a substantially residential area—the permit would not move forward. In addition, throughout the application review process, DEQ "shall accept public comment," a factor we cannot disregard as meaningless to the approval process. Section 82-4-432(4)(b)(iii), MCA; *see*

21

*Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 15, 344 Mont. 1, 185 P.3d 1003 ("We must presume that the Legislature would not pass useless or meaningless legislation.") (citation omitted).

¶40    HSG argues that since it already has a permit for the initial 110 acres, "it is a legal certainty that, but for the zoning, it would receive a permit amendment for the additional 310 acres when it submitted an acceptable application."   HSG overlooks that any amendment to an operating plan must meet the same requirements as the original permit application in order to be "acceptable."   *See* §§ 82-4-432(11)(a) and 82-4-434(5)(b)(i), MCA.   The only exception—that an amendment application is not subject to the public notice and meeting requirements "unless it proposes an increase in permitted acreage of 50% or more"—does not apply because HSG proposes a nearly three-fold increase in the permitted acreage. *See* § 82-4-432(11)(b), MCA.   Additionally, the original 110 acres for which DEQ granted a mining permit are located centrally within HSG's larger property. HSG acknowledged during oral argument before this Court that the remaining acreage was intended, at least in part, to serve as a buffer zone which protects the health, safety and welfare of the surrounding residential area.   Without this protective barrier in place, DEQ certainly would need to reevaluate the "noise and visual impacts on residential areas" and ensure safeguards to "prevent significant physical harm to the affected land or adjacent land, structures, improvements, or life forms" prior to granting a permit amendment.   Section 82-4-434(3)(m)-(n), MCA.

¶41 The plaintiff in *Seven Up Pete* argued similarly to HSG that it had been deprived of an alleged right to seek a permit to conduct cyanide heap leach mining because it would have had the opportunity for a favorable permit decision but for enactment of an initiative that banned such operations. *Seven Up Pete*, ¶ 22. We concluded that the "State had wide discretion to reject the Venture's permit application, even without the enactment of I-137," because permit approval "required convincing the State that this cyanide leaching project was appropriate . . . ." *Seven Up Pete*, ¶ 32. Here, although the specific statutory language is not as permissive as that considered in *Seven Up Pete,* the applicant for a gravel mining permit or permit amendment likewise must convince DEQ that its mining proposal is "acceptable," according to the criteria listed in §§ 82-4-432 and 82-4-434, MCA, before a permit will issue. Thus, it is not just a matter of filling in the blanks on an application form; DEQ unquestionably retains discretion, at a minimum, to "withhold its approval." *Kiely*, ¶ 28. We agree with the District Court, therefore, that HSG does not have a constitutionally protected property interest in its right to apply for a mining permit or permit amendment.

¶42 Absent a property right in HSG's "opportunity" to obtain expansion of its permit, the question becomes whether the County's adoption of the development pattern and zoning regulations affected and limited the use of HSG's land to such an extent that a taking occurred. The Supreme Court has directed that, when faced with a claim that regulations have gone "too far," courts should consider "whether the interference with [a party's] property is of such a magnitude that 'there must be an exercise of eminent

23

domain and compensation to sustain [it].'" *Penn Central*, 438 U.S. at 136, 98 S. Ct. at 2665.

¶43    Thus, "[w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457 (2001) (citing *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659); *see also Laurel Park Community, L.L.C. v. City of Tumwater*, ___ F.3d ___, 2012 U.S. App. LEXIS 22330 (9th Cir. Oct. 29, 2012) (No. 11-35466).  Zoning regulations rarely amount to a taking of property on the ground that they affect some property owners more severely than others, "because a landowner is not entitled to the highest and best use of [its] property." *Animas Valley Sand and Gravel, Inc. v. Bd. of Co. Comm'rs of the Co. of La Plata*, 38 P.3d 59, 65 (Colo. 2001) (citing *Penn Central*, 438 U.S. at 125, 98 S. Ct. at 2659-60) (other citations omitted); *Laurel Park Community*, ___ F.3d at ___ ("As a general rule, zoning laws do not constitute a taking, even though they affect real property interests . . .") (citing *Penn Central*, 438 U.S. at 125, 98 S. Ct. at 2659-60).  *Palazzolo* makes clear that *Penn Central* requires an "ad hoc," fact-specific inquiry where the property retains economic value but, "when its diminished economic value is considered in connection with other factors, the property effectively has been taken from its owner." *Animas Valley Sand and Gravel*, 38 P.3d at 66.  This ad hoc inquiry provides a safety

24

valve "to protect the landowner in the truly unusual case." *Animus Valley Sand and Gravel*, 38 P.3d at 66.

¶44 Our inquiry for purposes of this appeal is limited to whether HSG even may assert such a claim arising out of the impact of the zoning regulations on its real property interests. In *Kafka v. Montana Dep't of Fish, Wildife and Parks*, 2008 MT 460, ¶ 66, 348 Mont. 80, 201 P.3d 8, considering whether government action had constituted a taking of the appellant ranchers' land, fixtures and livestock, we held as a threshold matter that "[t]here is no question that a person has a compensable property interest arising out of the ownership of such real and personal property." The County argues that, because HSG's mining permit is not virtually assured, *Seven Up Pete* also disposes of any claim arising from its ownership of real property. The County points out that, while the plaintiff in *Seven Up Pete* possessed only a leasehold interest, our holding that there was no viable constitutional claim of entitlement also applies in cases of fee title ownership, such as *Germann v. Stephens*, 2006 MT 130, 332 Mont. 303, 137 P.3d 545 and *Roe v. City of Missoula*, 2009 MT 417, 354 Mont. 1, 221 P.3d 1200.

¶45 Neither *Seven Up Pete*, *Germann*, nor *Roe*, however, evaluated the threshold inquiry whether a protected property interest arises from ownership of land. In each case, rather, we considered whether the plaintiff had a protected interest in an opportunity—to apply for a mining permit, *Seven Up Pete*, ¶ 22; to obtain a liquor license in order to operate a casino and bar, *Germann*, ¶¶ 30-31; and to obtain an exemption from subdivision review, *Roe*, ¶ 43. In all three cases, we rejected the claim that a lost

25

opportunity to obtain a government permit or exemption amounted to a taking of a compensable property interest. Likewise, as discussed above, HSG is foreclosed from basing its takings claim on any alleged lost opportunity to mine its additional 310 acres.

¶46 It is axiomatic, however, that the protections of "private property" under Article II, § 29 of the Montana Constitution and the Fifth Amendment to the United States Constitution apply to real property owned in fee. *See e.g. Kafka*, ¶ 33 (indicating that a constitutionally protected property interest exists where "the citizen had the rights to exclude, use, transfer, or dispose of the property") (quoting *Members of the Peanut Quota Holders Ass'n, Inc. v. U.S.*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (internal quotation marks omitted)). Here, HSG claims a compensable interest by virtue of its investment in 421 acres of real property located in District 43 and the impact of the zoning regulations on the value of that parcel of property.

¶47 In *Kafka*, we recognized that a plaintiff may assert a takings claim, even if not entirely deprived of the established property interest. We stated that, "even when a compensable property interest still retains economic value, just compensation may be required if 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Kafka*, ¶ 69 (quoting *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659) (internal quotation marks omitted). We recognized that "[d]etermining when such compensation is required is essentially an 'ad hoc, factual inquiry,' based on the

26

circumstances of each case." *Kafka*, ¶ 69. In order to make this factual inquiry, we adopted the three factors provided by the United States Supreme Court in *Penn Central*:

> (1) the character of the governmental action; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant.

*Kafka*, ¶ 69 (citing *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659). Each of these factors "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from [its] domain." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082 (2005). In *Palazzolo*, for example, the Court concluded that, although the plaintiff's waterfront parcel retained substantial economic value despite coastal wetlands regulations restricting use, "the claims under the *Penn Central* analysis were not examined, and for this purpose the case should be remanded." *Palazzolo*, 533 U.S. at 632, 121 S. Ct. at 2465. We do the same here. On remand, the District Court must consider "the magnitude of the economic impact and 'the degree to which it interferes with legitimate property interests.'" *Kafka*, ¶ 71 (quoting *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082).

¶48 Because, as recognized in *Kafka*, HSG has a constitutionally protected property interest by virtue of its ownership of a 421-acre parcel of real property, we will grant its request for remand to the District Court for the parties to "brief the *Penn Central* takings test . . ." under the second prong of the takings analysis, narrowly limited to whether the

27

County's adoption of the zoning pattern and regulations in District 43 constituted a taking of HSG's real property interest without just compensation.

¶49    Affirmed in part and remanded for further proceedings consistent with this Opinion.

/S/ BETH BAKER

We concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

Justice James C. Nelson, concurring in part and dissenting in part.

¶50    I agree generally with the result of the Court's Opinion—i.e., that HSG is entitled to seek relief for the taking of its property interest in its sand and gravel operations. I thus concur in the Court's decision as to Issue 3. I dissent, however, from the Court's decision on Issues 1 and 2. While I am not going to belabor the point, the County's adoption of District 43, here, was little more than illegal reverse spot zoning. The record demonstrates that District 43 was specifically designed to gerrymander HSG out of its ability to extend its mining operation onto its remaining property. The fact that this was accomplished as a result of a petition by other landowners (Part 1 zoning) is beside the point. The "zone" was carefully crafted to deprive HSG of the further use of its property. I am not persuaded that, but for the creation of District 43, there was any real doubt that

28

HSG would have been entitled to a further open cut mining permit for its other 311 acres. It is simply a bootstrap argument to say that the permit to further mine would not have been granted by DEQ because of the zoning. Moreover, District 43 was not adopted because of the Growth Policy. Rather, the zoning was put in place specifically to prevent HSG from mining sand and gravel on the remainder of its property. Illegal spot zoning does not become legal if there is something in the Growth Policy that might support it. And the County's rationale to that effect is simply smoke and mirrors. Indeed, District 43 was and is the poster child of NIMBY (not in my back yard) zoning.

¶51     It strikes me that this is yet another example where a majority of citizens decide they do not like a particular business operation, although that operation is perfectly legal, and thus set out to restrict the business's operations through a "carefully crafted" measure, but without any expectation of having to compensate the business owner. *Cf. Kafka v. Mont. Dept. of Fish, Wildlife & Parks*, 2008 MT 460, ¶¶ 96-248, 348 Mont. 80, 201 P.3d 8 (Nelson & Rice, JJ., & Swandal, D.J., dissenting). The constitutional guarantee "that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). It seems to me this principle ought to apply to the residents of District 43. Accordingly, I am in agreement with the Court's decision to remand for takings proceedings. In this regard, I also join ¶¶ 55-57 of Justice Rice's concurring and dissenting opinion.

¶52 Finally, I continue to maintain that Montana's seeming lock-step reliance on federal takings jurisprudence is a mistake. Article II, Section 29 of Montana's Constitution sets forth this State's organic law on eminent domain. As I explained, in detail, in *Buhmann v. State*, 2008 MT 465, 348 Mont. 205, 201 P.3d 70, Article II, Section 29, as a fundamental right, triggers the highest level of protection by Montana's courts, and our enforcement of this right must take into account other coordinate and overlapping guarantees in Montana's Declaration of Rights. *Buhmann*, ¶¶ 131-135 (Nelson, J., & Swandal, D.J., dissenting). Moreover, the language of Montana's eminent domain provision is different than that of its federal counterpart in the Fifth Amendment. Article II, Section 29 guarantees just compensation to the full extent of the loss where private property has been "taken or damaged for public use." The problem is that this Court will continue to rely, lock-step, on federal takings jurisprudence until such time as Montana counsel begin to argue for the broader protections afforded under Article II, Section 29 in the trial courts and on appeal. There always has to be a first case.

¶53 With the foregoing observations, I concur in part and dissent in part from the Court's decision and join ¶¶ 55-57 of Justice Rice's Concurrence and Dissent.

/S/ JAMES C. NELSON

Justice Jim Rice, concurring in part and dissenting in part.

¶54 I concur with the Court's resolution of Issue 1. I also agree with the thrust of Justice Nelson's Concurrence/Dissent. I particularly agree with his conclusion that there

was no "real doubt that HSG would have been entitled to a further open cut mining permit," Concurrence/Dissent, ¶ 50, and for that reason I would conclude that under this record HSG established a constitutionally protected property interest in pursuing a permit and remand on that issue as well.

¶55 This case differs significantly from *Seven Up Pete* in that HSG not only owns the gravel outright, but it has already obtained a permit and is currently mining. The Court scours the statutes for pockets of agency discretion to deny further permitting, Opinion, ¶ 37, but in doing so the Court in my view over-emphasizes the theoretical basis for denying further permitting and under-emphasizes the factual reality that HSG has been previously successful in satisfying all of these concerns. We have never stated that the certainty of obtaining a permit must be absolute, but this decision pushes to that end. I cannot recall a case in the years of my tenure where the Court has approved a takings claim; all have been denied. A survey of the Court's jurisprudence reveals a seeming course to make takings claims more difficult to establish, to the point, as Justice Nelson explains, that legal business operations can be shuttered by the government "without any expectation of having to compensate the business owner." Concurrence/Dissent, ¶ 51.

¶56 We forget, I think, that the right of compensation for the loss of private property to public purpose is one of the Bill of Rights and the Declaration of Rights, just like any other civil right this Court is tasked with protecting. As a matter of basic civics, I find it hard to believe that, in a democracy formed upon the concept of private property rights, the government can prohibit a party from extracting gravel from the land it owns, which

31

the party is already extracting under permit, and do so with no obligation to recompense the party for taking the value of this extractable property right out from beneath them. I believe many citizens would be surprised to learn this as well.

¶57 It may be helpful to remember at this juncture that, ultimately, the citizens are the masters of the government, the courts, and the law. If, in their view, government is overstepping its bounds, and the law is deemed powerless by the courts to stop the transgression, the citizens can petition for their grievances, change the law, and curtail the government. As thorny as the takings issue may be, the Legislature is nonetheless empowered to legislate on the issue, and the citizens are empowered to propose direct initiatives, to provide greater protections against government action they deem to be excessive.

¶58 I concur and dissent.

/S/ JIM RICE