DA 10-0518

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 156

GREGORY TERNES,

      Plaintiff and Appellant,

  v.

STATE FARM FIRE AND CASUALTY
COMPANY, KEITH EBERHARD,
SUE EBERHARD,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Fourth Judicial District,
                     In and For the County of Missoula, Cause No. DV-08-1306
                     Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Kathleen O'Rourke Mullins, Robert Terrazas, Terrazas Law Offices,
                Missoula, Montana

        For Appellee State Farm Fire and Casualty Company:

                Bradley J. Luck, Kathleen L. DeSoto, Garlington, Lohn & Robinson,
                PLLP, Missoula, Montana

        For Appellees Keith Eberhard and Sue Eberhard:

                Quentin M. Rhoades, Liesel Shoquist, Sullivan, Tabaracci
                & Rhoades, P.C., Missoula, Montana

Submitted on Briefs:  May 25, 2011

Decided:  June 28, 2011

Filed:

_____
                           Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Gregory Ternes (Ternes) appeals the orders of the Fourth Judicial District Court, Missoula County, granting separate summary judgments for defendants State Farm Fire and Casualty Company (State Farm) and Keith and Sue Eberhard (Eberhards). We affirm.

## ISSUES

¶2    A restatement of Ternes' issues on appeal is:

¶3    1.  Whether the District Court abused its discretion when it declined to indefinitely stay all pretrial proceedings after Ternes filed motions for leave to join defendants Eberhards and to amend his complaint.

¶4    2.  Whether the District Court erred in concluding there were no genuine issues of material fact as to the reason Peter and Elizabeth Giardino (Giardinos) unilaterally terminated the Buy-Sell Agreement to purchase Ternes' Missoula Residence.

¶5    3.  Whether the District Court erred in concluding there were no genuine issues of material fact precluding summary judgment on Ternes' claim that he suffered damages as a result of either State Farm's or the Eberhards' conduct.

¶6    4.  Whether the District Court erred in concluding, as a matter of law, that Ternes was not a consumer as defined by the Montana Consumer Protection Act (MCPA) and, therefore, that the MCPA did not apply.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7    The dispute in this case surrounds Ternes' residential property located on Skyview Drive in Missoula, Montana (Residence). The Eberhards owned the Residence from

2

2004 until they sold it to Ternes in July 2007, and they insured it through State Farm.  On June 10, 2006, Susan Eberhard placed a call to a State Farm claims reporting office to discuss water damage.  The initial claims handler recorded the conversation with Susan Eberhard as "water in the basement."  Later the same day, a second State Farm claims handler, Heather Derenski, called Susan Eberhard to discuss the prior call.  Derenski's activity log notes in the claim file indicate that Susan described heavy rains, saturated ground, and water seeping in through the foundation.  Derenski's notes also indicate that she advised Susan that the Eberhards' policy did not provide coverage for water seepage.

¶8     Derenski stated in deposition that at the time of the call, she understood Eberhard to be reporting a claim of water damage to the basement of the Residence and, accordingly, she coded the call as a "cause of loss" that was "closed without payment" (CWP) since the Eberhards' policy did not cover water seepage.  In her deposition, Susan Eberhard maintained that the purpose of the call was not to report a claim, but to inquire as to the extent of her coverage because she had recently overheard neighbors discussing water seepage problems in their South Hills homes due to the heavy rains.  She took no further action after Derenski informed her water damage was not covered under her policy.  Between June 10, 2006, and the date they sold the property to Ternes in July 2007, the Eberhards did not perform any maintenance or repair work in the Residence's basement for water damage.  In July 2008, at the behest of Ternes' counsel, the Eberhards executed a separate disclosure statement stating "[d]uring our ownership of [the Residence], we did not experience water inundation or water damage to the daylight

3

basement of the residence that would have adversely or materially affected the value, condition, or habitability of the residence."

¶9　The June 10, 2006 phone call from Sue Eberhard was coded as a claim by State Farm and reported on the "Comprehensive Loss Underwriting Exchange" (C.L.U.E.). C.L.U.E. is a claims history database operated by a third party company, ChoicePoint, who generates reports containing consumer claim information provided by insurance companies that subscribe to the database. Relevant to this case is the C.L.U.E. Report generated for the Residence that discloses the June 10, 2006 claim by Sue Eberhard discussed above (hereinafter "the C.L.U.E. Report").

¶10　On July 18, 2007, Ternes purchased the Residence from the Eberhards for $230,000. Prior to the purchase, Ternes had the home inspected by Thomas Barkley, a professional home inspector whose report was filed in this case pursuant to a District Court order. Germane to this case, it stated under the section titled "Basement Floor and Drainage" that there were "symptoms of water entry in the basement."

¶11　Ternes insured the Residence through Farmers Insurance Exchange. His Farmers agent, David Clarke, testified that he noted the C.L.U.E. Report when placing homeowner's insurance on the Residence, as was the normal course of business for Farmers when insuring a new property. Clarke stated that he did not inform Ternes of the existence of the C.L.U.E. Report on the Residence because it had no bearing on Ternes' ability to secure homeowner's insurance, nor did it affect the amount of the premium.

¶12　On May 27, 2008, less than a year after he purchased the Residence, Ternes listed it for sale at $249,900—almost $20,000 above what he paid for it. On May 28, 2008, the

4

Giardinos signed a Buy-Sell Agreement (Buy-Sell) to purchase the Residence that contained, among others, a contingency clause allowing the Giardinos to unilaterally terminate the agreement if they were not satisfied with the financing they received. The Giardinos initially offered Ternes $240,000 and Ternes countered at $245,000. The Giardinos agreed to the counter-offer. That same day, the Giardinos met with their banker to discuss financing based on the purchase price of $245,000. As a result of that meeting, the Giardinos felt they could not afford to purchase the Residence.

¶13 On June 2, 2008, the Giardinos notified Scott Tempel, their realtor, of their decision not to go forward with the purchase. They signed a Termination of Buy-Sell, which Tempel immediately faxed to Diane Beck, Ternes' realtor. The Giardinos later testified that at some point after they decided not to purchase the Residence, they learned of the C.L.U.E. Report through Tempel, but they also stated that it had no bearing on their decision to terminate the Buy-Sell. The Giardinos never sought a quote for homeowners insurance, an appraisal, or a home inspection on the Residence. On June 16, 2008, the Giardinos made an offer on another home, which they also terminated because they were not able to secure satisfactory financing.

¶14 On June 19, 2008, at Beck's request, Tempel prepared an Addendum to the Buy-Sell Termination (Addendum) which stated the purchase agreement was terminated based on the Giardinos "inability to get hazard insurance at a rate and terms that are acceptable to [them]." When deposed, Tempel and the Giardinos stated that the Addendum was prepared entirely by Tempel and the Giardinos signed it only because Tempel asked them to; Elizabeth Giardino did not recall signing the Addendum because

5

she was still in the hospital having recently given birth to her son. Notably, it is undisputed that the Giardinos were under no obligation to provide the Addendum because, pursuant to the terms of the Buy-Sell, the purchase agreement was terminated on June 2, 2008, when the Giardinos signed the Termination of Buy-Sell.

¶15 In the meantime, on June 4, 2008, Ternes contacted State Farm and Susan Eberhard after learning of the C.L.U.E. Report from Beck. On June 10, 2008, after speaking with Susan Eberhard, State Farm recoded the claim from CWP to "opened in error" (OIE) and explained the steps necessary for the Eberhards to remove the OIE claim from the C.L.U.E. website. On June 18, 2008, ChoicePoint notified State Farm that the Eberhards had disputed the claim on the C.L.U.E. website. On July 3, 2008, State Farm confirmed the disputed claim was OIE and instructed ChoicePoint to remove the claim from the C.L.U.E. database and website, which it did.

¶16 On July 29, 2008, Ternes filed a complaint with the Montana Commissioner of Insurance alleging that State Farm put false information on the C.L.U.E. website causing the sale of the Residence to the Giardinos to fall through. State Farm responded to the complaint, relaying the same chronology of events discussed above. The Montana Commissioner of Insurance Specialist responded to Ternes on August 19, 2008, advising him that State Farm had not submitted a false report "as per [State Farm's] understanding at the time of the loss." On October 22, 2008, Ternes filed the instant action in the District Court, naming only State Farm as a defendant. In January 2010, his complaint was amended to add claims against the Eberhards. Additional facts are included below as necessary.

6

## STANDARDS OF REVIEW

¶17 Though none of the parties assert a standard of review for Issue One, "we review district court orders related to trial administration matters, such as motions to stay, for abuse of discretion." *Lamb v. Dist. Court of the Fourth Jud. Dist.*, 2010 MT 141, ¶ 14, 356 Mont. 534, 234 P.3d 893. "The test for abuse of discretion is whether the district court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Kulstad v. Maniaci*, 2010 MT 248, ¶ 23, 358 Mont. 230, 244 P.3d 722.

¶18 We review de novo a district court's ruling on motions for summary judgment applying the same M. R. Civ. P. 56(c) criteria as does a district court. *Marx v. Belgrade Volunteer Firefighters Relief Assn.*, 2008 MT 410, ¶ 15, 347 Mont. 256, 198 P.3d 247. The movant has the initial burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Peterson v. Eichhorn*, 2008 MT 250, ¶ 12, 344 Mont. 540, 189 P.3d 615. The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences will be drawn in favor of the party opposing summary judgment. *Id.* Once the movant meets this initial burden, the party opposing summary judgment must present substantial evidence, as opposed to mere denial, speculation, or conclusory statements, raising a genuine issue of material fact. *Id.* at ¶ 13 (internal citations omitted). Whether the movant is entitled to judgment as a matter of law is a legal conclusion we review for correctness. *Id.*

## DISCUSSION

7

¶19    *Issue One:  Did the District Court abuse its discretion when it declined to indefinitely stay all pretrial proceedings after Ternes filed motions for leave to join defendants Eberhards and to amend his complaint?*

¶20    Ternes argues he was prejudiced by the District Court's handling of pretrial proceedings.  Specifically, he complains that he was prejudiced because the District Court entertained State Farm's motions for summary judgment on January 13, 2010, without informing Ternes that it had just granted his motions for leave to amend his complaint and to add the Eberhards as parties.  Among other things, Ternes maintains that all pending proceedings should have been stayed by the District Court once leave to amend the complaint was granted, and that without a stay, State Farm was somehow able to short-circuit his opportunity to engage in discovery with the Eberhards.  Notably, however, Ternes did not specifically seek an indefinite stay nor did he seek to extend discovery deadlines.

¶21    As noted above, we review the grant or denial of motions to stay for abuse of discretion.  Given the complicated progression of this litigation, we cannot conclude the District Court acted arbitrarily or exceeded the bounds of reason in the manner in which it administered the pretrial proceedings in this case.  Therefore, we affirm on this issue.

¶22    *Issue Two:  Did the District Court err in concluding there were no genuine issues of material fact as to the reason Peter and Elizabeth Giardino unilaterally terminated the Buy-Sell Agreement to purchase the Residence?*

¶23    It is undisputed that, by the terms of the Buy-Sell, the Giardinos could unilaterally terminate the purchase within a certain time period if any one of the contingencies listed in the Buy-Sell was not met to their satisfaction.  The Buy-Sell contained the following contingencies:  financing, home inspection, appraisal, and insurance.  The Giardinos

8

unequivocally testified through deposition and affidavit that they simply could not afford to finance the purchase of the home and that they came to that decision before learning of the C.L.U.E. Report. They therefore terminated the Buy-Sell on June 2, 2008, pursuant to the financing contingency. The Giardinos also testified that they became aware of the C.L.U.E. Report only after Tempel told them about it during the phone call they initiated to inform him of their decision to terminate the purchase.

¶24    In his reply brief, Ternes directs us to a portion of Beck's testimony in which she asserted that Tempel told her that one of the Giardinos worked for an insurance company and pulled the C.L.U.E. Report on the Residence. Beck further testified that upon reading the C.L.U.E. Report's reference to water in the basement, the Giardinos decided to terminate the purchase of the Residence. However, Tempel stated in deposition that he had seen the C.L.U.E. Report because his wife worked for an insurance company and that he attached the C.L.U.E. Report to the Addendum because "[t]his was the simplest reason why [the purchase was terminated]. It wasn't the main reason why, but it was the simplest reason why . . . it was a reason why for me, yes. But was it a reason why for Pete and Elizabeth [Giardino], I can't answer that." Tempel further corroborated that the main reason the Giardinos terminated the agreement was financial considerations. Beck's testimony about Tempel's statements is hearsay, which cannot be used to defeat summary judgment. *Thornton v. Songstad*, 263 Mont. 390, 398, 868 P.2d 633, 638 (1994) ("clearly hearsay" statements are inadmissible for summary judgment proceedings); *see Eberl v. Scofield*, 244 Mont. 515, 519, 798 P.2d 536, 538 (1990) (holding that the district court did not err in striking the affidavit of a party filed in a

9

summary judgment proceeding because the affiant's statements related to the issue on summary judgment were not of the affiant's personal knowledge, but were all hearsay). The record is replete with evidence—testimonial and written—that the Giardinos could not, in fact, obtain satisfactory financing to be able to purchase the Residence for $245,000. Moreover, Ternes' counsel stated on the record that neither she nor Ternes had reason to question the truthfulness of the Giardinos' testimony.

¶25 On appeal, in an apparent attempt to create a material issue of fact, Ternes now questions the truthfulness of the Giardinos' testimony and argues that the C.L.U.E. Report was the real reason the Giardinos terminated the purchase, as evidenced by their signatures on the Addendum. However, Tempel testified, and the Giardinos corroborated Tempel's statements, that it was Tempel who drafted the Addendum, without input from the Giardinos and at the request of Beck, who requested the Addendum at the urging of Ternes' counsel. Ternes argues on appeal, without directing us to substantial evidence in the record, that the inferences from these events, when viewed in the light most favorable to Ternes as the non-moving party, demonstrate that the Giardinos were influenced by the C.L.U.E. Report and that it was the primary reason they terminated the purchase on June 2, 2008.

¶26 Both Giardinos explicitly stated the C.L.U.E. Report had no influence on their decision not to purchase the home, and Elizabeth went so far as to state in her deposition that a report of potential water damage would not be an automatic deal-breaker, but would be a reason for her to get a home inspection, something the Giardinos never sought on the Residence. Additionally, there is no evidence in the record that they either

10

accessed the C.L.U.E. website or knew about the C.L.U.E. Report prior to terminating the sale on June 2, 2008. In their depositions both Giardinos stated that they had never seen the C.L.U.E. Report until it was shown to them during their August 2009 depositions.

¶27 Once the moving party shows that there are no genuine issues of material fact, the burden shifts to the non-moving party to present substantial evidence, as opposed to mere denial, speculation, or conclusory statements, raising a genuine issue of material fact. *Peterson*, ¶ 13. While it is well established that when material facts are in dispute summary judgment is not a proper remedy, "mere disagreement about the interpretation of a fact or facts does not amount to genuine issues of material fact." *Mont. Bd. of Pharm. v. Kennedy*, 2010 MT 227, ¶ 9, 358 Mont. 57, 243 P.3d 415 (internal citations omitted). Moreover, "[u]nsupported arguments of counsel are not evidence and do not establish the existence of matters that are argued." *McKenzie v. Scheeler*, 285 Mont. 500, 508, 949 P.2d 1168, 1173 (1997).

¶28 Ternes relies on his and his counsel's unsubstantiated speculation that the C.L.U.E. Report caused the sale of the Residence to the Giardinos to fail. However, in his briefing to this Court, Ternes does not direct us to any competent evidence in the record to support his argument. Upon a careful and thorough review of the record, we conclude that Ternes does not present any genuine issue of material fact with regard to the reason the Giardinos terminated the Buy-Sell Agreement on the Residence. Therefore, the District Court did not err in this regard.

¶29 *Issue Three: Did the District Court err in concluding there were no genuine issues of material fact precluding summary judgment on Ternes' claim that he suffered damages as a result of either State Farm's or the Eberhards' conduct?*

¶30 In its March 24, 2010 order granting State Farm summary judgment, the District Court concluded that Ternes suffered no damage from the lost sale as a result of the C.L.U.E. Report because no evidence existed to demonstrate that the Giardinos terminated their purchase of the Residence as a result of the C.L.U.E. Report. In its August 31, 2010 order granting the Eberhards' motion for summary judgment, the District Court concluded that Ternes had not presented substantial, competent evidence that the Eberhards caused the sale of the Residence to the Giardinos to fail, nor had he raised a genuine issue of material fact beyond speculation that the Eberhards caused Ternes any damages. In fact, Ternes had testified he believed the Residence was not selling because of the economy and because he felt it was not worth the price he paid in 2007. Ternes further testified that he has not reduced the sale price of the Residence from the original 2008 listing price of $249,900, even though he conceded that the market had experienced a downturn.

¶31 On appeal Ternes concedes that "[t]he record as a whole demonstrates that it was not just the C.L.U.E. Report that has caused Greg damage." This concession underscores the weakness of both the damage claim against the Eberhards and the case against the Eberhards as a whole. Although Ternes stresses that Susan Eberhard's telephone report to State Farm triggered the C.L.U.E. Report and the ensuing series of allegations, he does not establish what duty the Eberhards owed him at the time, much less that a duty to him was breached. The 2006 phone call from Susan Eberhard to State Farm occurred more than a year before Ternes even entered the picture to purchase the Residence. Thus, there

was no relationship between the parties in 2006 giving rise to a duty running from the Eberhards to Ternes. *See Busta v. Columbus Hosp.*, 276 Mont. 342, 362, 916 P.2d 122, 134 (1996) (discussing that foreseeability of risk is a chief element in determining whether a defendant owes a duty or obligation to a plaintiff and, absent foreseeability, there is no duty owed by a defendant to a plaintiff); *Hatch v. State Dept. of Highways*, 269 Mont. 188, 195, 887 P.2d 729, 733 (1994) (the existence of a duty is a question of law and "absent the existence of a duty, no negligence claim can be maintained").

¶32    In any event, the record clearly demonstrates that Ternes was unable to identify any substantial evidence in the record to support his argument that it was either the C.L.U.E. Report or the 2006 call from the Eberhards to State Farm that is causing him damage. Neither the economic downturn nor Ternes' refusal to adjust the listing price of the Residence are results of conduct of either the Eberhards or State Farm. Ternes' deposition testimony in this regard only reinforces this conclusion.

¶33    Ternes also claims that he was damaged by State Farm's response to the Insurance Commissioner, and by State Farm's defense of itself in this lawsuit. These arguments are without merit. Even a cursory review of the exchange between State Farm and the Insurance Commissioner reveals that State Farm relayed only its chronology of events— the same chronology it has maintained since the beginning of this lawsuit. State Farm is entitled to investigate and defend claims against it without that defense becoming an allegation in the case.

¶34    We conclude that Ternes cannot establish that he was damaged by the events surrounding the origin and eventual withdrawal of the C.L.U.E. Report, which is the only

connection Ternes has to either State Farm or the Eberhards. The District Court did not err in concluding State Farm and the Eberhards were entitled to summary judgment as a matter of law on the issue of damages.

¶35 *Issue Four: Did the District Court err in concluding, as a matter of law, that Ternes was not a consumer as defined by the MCPA and, therefore, that the MCPA did not apply?*

¶36 Finally, Ternes complains that the District Court erred in granting partial summary judgment in favor of State Farm because it concluded, as a matter of law, that Ternes was not a consumer as defined by the MCPA in relation to State Farm. Since we conclude above that the District Court did not err in granting summary judgment with regard to damages, we decline to address this claim made under the MCPA because only those individuals who suffer ascertainable damages may bring an individual complaint under the MCPA. Section 30-14-133(1), MCA ("A consumer who suffers *any ascertainable loss of money or property*, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by 30-14-103 may bring an individual but not a class action") (emphasis added). As discussed above in Issue Three, Ternes failed to demonstrate that he suffered ascertainable damages as a result of State Farm's or the Eberhards' conduct, so there is no need for us to opine on the merits of whether Ternes was a consumer under the MCPA in relation to State Farm.

## CONCLUSION

¶37 For the foregoing reasons, we conclude that the District Court did not err in granting summary judgment for State Farm and the Eberhards because there were no

14

genuine issues of material fact and both State Farm and the Eberhards were entitled to judgment as a matter of law, which the District Court correctly interpreted.

¶38    Affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JIM RICE