FILED

05/11/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0328

DA 20-0328

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 116

JAMES HARTSHORNE and ANGELO QUEIROLO,

Plaintiffs, Appellees, and Cross-Appellants,

v.

CITY OF WHITEFISH, WHITEFISH CITY COUNCIL,

Defendants,

and

IO2.5, a series member of IO-3, LLC,
a Montana Limited Liability Company,

Defendant and Appellant.

APPEAL FROM:     District Court of the Eleventh Judicial District,
                 In and For the County of Flathead, Cause No. DV-18-987(C)
                 Honorable Heidi J. Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Richard De Jana, Richard De Jana & Associates, PLLC, Kalispell, Montana

      For Appellees James Hartshorne and Angelo Queirolo:

          Lindsey W. Hromadka, Michelle T. Weinberg, Weinberg & Hromadka, PLLC, Whitefish, Montana

      For Appellees City of Whitefish and Whitefish City Council:

          Marcel A. Quinn, Tom A. Hollo, Hammer, Quinn & Shaw, PLLC, Kalispell, Montana

          Angela K. Jacobs, Whitefish City Attorney, Whitefish Montana

Submitted on Briefs: February 24, 2021

Decided: May 11, 2021

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    IO2.5, a series member of IO-3, LLC ("IO2.5"), appeals an Eleventh Judicial District Court Order granting summary judgment to James Hartshorne and Angelo Queirolo (collectively, "Hartshorne") on their claim that Whitefish City Ordinance 18-23 violates the uniformity requirement found in § 76-2-302(2), MCA, and striking certain conditional commercial uses allowed by the ordinance. Hartshorne cross-appeals the District Court's order denying summary judgment on its claim of spot zoning. We affirm the District Court's ruling that the City did not engage in illegal spot zoning and reverse its conclusion that Ordinance 18-23 violates the statutory uniformity requirement.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    This case concerns an undeveloped 2.5-acre parcel in The Lakes neighborhood in Whitefish, Montana, known as Area 2(c) or Lot 3 of the Plat of Riverside Senior Living Center. The surrounding neighborhood is primarily residential. IO2.5's predecessor, Barnes Whitefish, LLC, purchased Area 2(c) on March 27, 2014. IO2.5, a developer, alleges that "[t]he existence of the commercial [Planned Unit Development] component in the neighborhood plan was important to the purchaser because it assured flexibility in determining the best use of the property . . . [which] could not be changed without the growth policy and neighborhood plan first being amended . . . ." Hartshorne resides near Area 2(c).

3

¶3 The City of Whitefish adopted the Riverside at Whitefish Neighborhood Plan in 1993 as an amendment to the Whitefish City-County Master Plan. In 1999 it amended the Neighborhood Plan. The purpose of this amendment was to adjust the development focus of the area from a commercial component that would "attract an outside clientele" to a more community-based development that "still proposes commercial use but as a neighborhood center." The 1999 Neighborhood Plan "embodies the public policy for the area it addresses." It provides that "[a]ny land use ordinances or regulations, such as zoning or subdivision review, shall be based on this plan[.]"

¶4 The Neighborhood Plan covers approximately 230 acres, divided into five separate areas. Area 2, titled "Riverside Public Park Area, Neighborhood Center, and Future Development Site," is divided further into "three distinct segments." The Plan designated Area 2(a) as a ten-acre development site for assisted living and retirement housing; Area 2(b) as a twenty-acre public park; and Area 2(c) as follows:

> A 2.5 acre neighborhood center to meet the demand for basic services created by the walking community and youth athletic facility. The site will be developed under the auspices of a mixed PUD[1] whereby 10% of the gross

---

[1] A "Planned Unit Development" ("PUD") is

> [a] tract of land developed or proposed to be developed as an integrated unit. A PUD may be a planned residential development, a mix of residential uses and commercial uses, or it may consist of strictly commercial or industrial uses. This option is limited to the allowable density of the underlying use district and the predominant uses within the PUD must be that of the underlying zone.

Section 11-9-2, Whitefish City Code. Under § 11-2S-2(B), Whitefish City Code:

> The Mixed-Use PUD is primarily intended to provide for the mixing of compatible non-residential uses allowed in the underlying zone with residential units of various types in urban areas. Residential product types include single-family, two-family, and multi-family in any ownership configuration. Residential types also include

4

area of the site can be developed in commercial uses intended to be complimentary to the proposed development of the neighborhood.

¶5    The City adopted Ordinance 99-9 in 2000, which zoned all of Area 2 as WR-4 (High Density Multi-Family Residential)[2] with a PUD overlay. The ordinance required "that any future development must be submitted and reviewed as a PUD complete with

_____

units integrated into primarily non-residential structures, including above office and retail space. Where the zoning is both residential and non-residential, the amount of land dedicated to any non-residential component shall generally be consistent with and give due consideration to the location and extent of the non-residential zoning.
1.    A mixed-use PUD may be established in any Non-Residential Zoning District with the exception of the WB-4, the WI, and the WI-T, as well as where the overall development also includes both non-residential and residential zoning.
2.    Permitted uses:
- Accessory buildings and uses.
- Any uses permitted or conditionally permitted in the underlying zoning district, provided that any conditional use is specifically considered with the PUD and all conditional use criteria required under this Code for that use are met or conditioned with the PUD approval. If a proposed conditional use is not noted with the PUD application, then such uses must follow the standard CUP review process found in section 11-7-8 of this title. Other uses may also be considered for which justification can be derived on the basis that the use will be compatibly incorporated into the design and use of the planned development. Such uses should be integrated with and complementary to included and adjacent residential uses.
- Private and/or semiprivate recreation and service facilities intended for the residents of the district.
- Residential:
  - Single-family dwellings.
  - Two-family dwellings.
  - Multi-family dwellings.
  - A combination of any of the above arranged in attached, detached, townhouse, apartment, or condominium configurations

[2] WR-4 zoning regulations identify the following permitted uses: home occupations, homeowner's parks, public utility buildings and facilities when necessary for serving the surrounding territory, publicly owned or operated buildings, uses or recreational facilities including parks and playgrounds, and residential. WR-4 zoning conditionally allows the following uses: bed and breakfast establishments, boarding houses, catering services, churches or places of worship, daycare, hostels, nursing or retirement homes, private recreational facilities, certain residential uses, schools, and type I and type II community residential facilities. Sections 11-2I-2, -3, Whitefish City Code.

public and City review," and it established that "[d]evelopment of Area 2 would further be subject to the terms of the Riverside at Whitefish Neighborhood Plan Amendment." This classification along with the Neighborhood Plan's specifications allowed Area 2(c) to be developed for both commercial and residential purposes.

¶6 The City later passed Ordinance 99-17, ordering the zoning map amended for Area 2(a) to allow it to retain a WR-4 zoning classification but with a residential PUD designation added. Area 2(b) was dedicated as a park in 2003, subjecting it to additional use regulations due to parks being covered by a separate title of the Whitefish City Code.

¶7 In 2018, the City proposed new PUD regulations that would preclude commercial development in residential areas. Specifically, the PUD regulations disallow Mixed-Use PUDs, Commercial PUDs, or Light Industrial or Industrial PUDs in primarily residential areas. The City and IO2.5 maintain that Area 2(c) was the only property within the City for which the new PUD regulations would prohibit development as called for in its Neighborhood Plan. Given this discrepancy for Area 2(c), IO2.5's representative attended the March 2018 hearing on these PUD regulations. Following discussion there with the Zoning Administrator, the Zoning Administrator proposed via e-mail a solution to IO2.5's representative:

> I think the best solution for your client, short of applying before the new regulations go into effect, would be to apply for a PUD amendment asking to change that condition that requires a new PUD to something different like a CUP.[3] I think the commercial use of that property would be vested with the prior approval.

---

[3] A "Conditional Use Permit" ("CUP") is "[a]n authorization to conduct a use or activity" as required under the Whitefish City Code; conditional uses requiring a CUP "require a special degree

6

The City passed Ordinance 18-09, containing the new PUD regulations, in April 2018.

¶8     As recommended by the Zoning Administrator, IO2.5 then filed a request with the City to amend Ordinance 99-9 to allow use of a CUP instead of a PUD to develop Area 2(c) and to further define the permitted uses. IO2.5 proposed the following amendment:

> The remaining phases shall be reviewed under the provisions of Section 11-7-8: Conditional Use Permits. Uses permitted on Lot 2C (Lot 3 of the Plat of Riverside Senior Living Center) are as follows:
>
> Any uses that are permitted or conditionally permitted in the underlying WR-4 district;
>
> The following uses which are permitted or conditionally permitted in the City's WB-1 Limited Business District:
>
> - Clubs
> - Private and commercial recreational facilities
> - Professional office
> - Restaurant, excluding drive-ins, including on-premises beer/wine sales
> - Retail sales and service (less than 4,000 square feet enclosed gross floor area per lot of record; no outside storage or display);
>
> Any other uses for which justification can be derived on the basis that the use will be compatibly and harmoniously incorporated into the unitary design of the planned development.
>
> A change of use within the Neighborhood Center to a use not specifically listed herein shall require an administrative Conditional Use Permit prior to occupancy.

¶9     In July 2018, City staff drafted a report ("Staff Report") regarding the application, describing the purpose of IO2.5's request as:

---

of control to make such uses consistent with and compatible to other existing or permissible uses in the same area." Section 11-9-2, Whitefish City Code.

provid[ing] the property owner a clear path for development to maintain the property's vested rights for neighborhood commercial [use] while preserving the public process when development of the property does occur. The previously approved [PUD] approved a portion of the property to develop as neighborhood commercial but set a condition that a new PUD would be required prior to the development.

The Staff Report stated that the new PUD regulations "only offered uncertainty for the developer," and that "[u]sing the [CUP] continues to require a public process and a predictable development path for the property owner and the public." It found that IO2.5's proposed amendment conformed to the Neighborhood Plan, which "established the character of the neighborhood"; it further found that changing the discretionary review process to a CUP would "not change the overall goals for this neighborhood," nor would the amendment "in and of itself . . . change the character of the neighborhood. Retaining the ability for public review during development . . . will ensure neighborhood character through implementation of the Neighborhood Plan[.]" The Staff Report also indicated that it "directed the applicant to look at the City's WB-1 zoning district, as this is the City's neighborhood commercial district," "[b]ecause the language in the Neighborhood Plan was not specific." It recommended a standard CUP instead of an administrative CUP for any proposed development.[4]

¶10 The City Council notified the public and held two meetings on the issue on July 19 and August 6, 2018. The public, including Hartshorne and their counsel, submitted both

_____

[4] An administrative CUP involves a reduced public process, requiring notification only to property owners within 300 feet of the subject parcel, notice in a newspaper at least fifteen days prior to the permit's issuance, and the City's mitigation of public concerns through conditions of approval. If the City cannot mitigate such concerns through standard conditions of approval, it must hold a public hearing according to the standard CUP process. Section 11-7-8(M), Whitefish City Code.

written and oral comment, largely voicing lack of support for such an amendment; Hartshorne's summary judgment brief summarized the public's concerns as being "against specific commercial uses, such as clubs, bars, and/or restaurants contemplated for [Area 2(c)], as well as concerns about safety, traffic, wildlife and open space, and the conditional uses generally changing the quiet community feel of the development."

¶11 Following consideration of the application, the Staff Report, and the public's testimony, on August 6, 2018, the City Council approved IO2.5's request on the first reading of Ordinance 18-23. It then approved Ordinance 18-23 on August 20, 2018, directing the amendment of the official zoning map and permitting development of Area 2(c) through a CUP instead of a PUD. In addition to the uses permitted in the overlying WR-4 regulations, the ordinance included IO2.5's proposed permitted uses that would be subject to the CUP process: clubs; private and commercial recreational facilities; professional offices; restaurants, excluding drive-ins, including on-premises beer/wine sales; and retail sales and service (less than 4,000 square feet enclosed gross floor area per lot of record and no outside storage or display). It further permitted "[a]ny other uses for which justification can be derived on the basis that the use will be compatibly and harmoniously incorporated into the unitary design of the planned development." Finally, Ordinance 18-23 noted that it adopted as findings of fact the Staff Report and the Whitefish Planning and Building Department's letter of transmittal.

¶12 Hartshorne filed their complaint against the City of Whitefish and the Whitefish City Council (collectively, "the City") on September 18, 2018, seeking a declaratory judgment invalidating Ordinance 18-23 based on the adverse effect any

9

commercial development of Area 2(c) would have on the use and enjoyment of their properties and property values. The second amended complaint alleged eight counts, of which only two are at issue on appeal: spot zoning and violation of § 76-2-302(2), MCA. The District Court joined IO2.5 as a defendant, and IO2.5 filed a cross-claim against the City. The parties filed cross-motions for summary judgment, and on March 10, 2020, the District Court issued its Order. The court granted the City's motion on all counts, except the claim that the ordinance violated the uniformity requirement found in § 76-2-302(2), MCA, on which it agreed with Hartshorne. The court declined to void the ordinance, however, and instead struck the defined conditional uses not otherwise existing under the WR-4 permitted uses, including clubs, restaurants, retail sales, and retail services. The court ruled IO2.5's motion moot, and it denied IO2.5's subsequent motion to alter or amend the judgment. IO2.5 appealed the District Court's ruling on the uniformity requirement found in § 76-2-302(2), MCA, and Hartshorne cross-appealed the District Court's ruling on the spot-zoning claim.[5]

## STANDARDS OF REVIEW

¶13 We review a district court's summary judgment ruling de novo, applying M. R. Civ. P. 56. *Wagner v. Woodward*, 2012 MT 19, ¶ 16, 363 Mont. 403, 270 P.3d 21

---

[5] The City filed a response brief as Appellee, which included argument supporting IO2.5's position on the uniformity requirement. Hartshorne filed a motion to strike the City's brief and dismiss its appeal on the uniformity issue for failure to file a Notice of Appeal. We denied Hartshorne's motion on January 26, 2021, concluding that it would be "inefficient to probe the merits . . . without having had the opportunity to review the briefs and record[.]" We have considered the City's briefing on the uniformity requirement only to the extent its legal authority and analysis provide clarity to IO2.5's argument and the applicable law. *See Montanans v. State*, 2006 MT 277, ¶ 18, 334 Mont. 237, 146 P.3d 759 (citing M. R. App. P. 4(b)).

10

(citation omitted). Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *Wagner*, ¶ 16 (citation omitted).

¶14 We review de novo a district court's interpretation and application of a statute, including a county or city ordinance, to determine whether it is correct. *Wright v. Mahoney*, 2003 MT 141, ¶ 5, 316 Mont. 173, 71 P.3d 1195 (citations omitted); *DeVoe v. City of Missoula*, 2012 MT 72, ¶ 11, 364 Mont. 375, 274 P.3d 752 (citation omitted). For zoning decisions, we generally give deference to the decision of the local zoning board, limiting review to "whether the information upon which the decision maker based its decision was so lacking in fact and foundation as to be clearly unreasonable, thus constituting an abuse of discretion." *DeVoe*, ¶ 10 (citation omitted); *Citizens for a Better Flathead v. Bd. of Cty. Comm'rs of Flathead Cty.*, 2016 MT 325, ¶ 42, 385 Mont. 505, 386 P.3d 567; *see also Lake Cty. First v. Polson City Council*, 2009 MT 322, ¶ 37, 352 Mont. 489, 218 P.3d 816 ("Zoning is a legislative enactment and thus is presumed to be valid and reasonable.").

## DISCUSSION

¶15 *1. Whether the District Court erred in ruling that Ordinance 18-23 did not constitute spot zoning.*

¶16 Spot zoning generally comprises "the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners." *State ex rel. Gutkoski v. Langhor*, 160 Mont. 351, 353, 502 P.2d 1144, 1145 (1972) (quoting *Thomas v. Town of Bedford*, 184 N.E.2d 285, 288 (1962)) (internal quotation marks omitted). Montana courts

11

use a three-part framework to determine whether impermissible spot zoning has occurred: (1) whether "the requested use is significantly different from the prevailing use in the area"; (2) whether "the area in which the requested use is to apply is rather small"; and (3) whether "the requested change is more in the nature of special legislation." *Little v. Bd. of Cty. Comm'rs of Flathead Cty.*, 193 Mont. 334, 346, 631 P.2d 1282, 1289 (1981). The second and third elements of the *Little* test are analyzed together. *Boland v. City of Great Falls*, 275 Mont. 128, 134, 910 P.2d 890, 894 (1996). All three elements typically exist when spot zoning is present, though a court need not necessarily find all three elements for spot zoning to occur. *Little*, 193 Mont. at 346, 631 P.2d at 1289.

¶17 The District Court found the first element of the *Little* framework satisfied, noting that "there are no clubs, private and commercial recreational facilities, public restaurants including on-premises beer/wine sales, or retail sales and service in the Property's neighborhood, leading to the conclusion that the scope of use that Ordinance 18-23 permits is significantly different from the prevailing use in the area." It concluded, however, that while the area is small and the ordinance clearly benefits IO2.5, the second and third elements were not met because "as a matter of adopted policy under the Neighborhood Plan," the commercial component "is deemed to be in the community interest." Noting that § 11-2-3(B)(4), Whitefish City Code ("WCC"), designates that neighborhood plans serve as a guide for land use regulations, it stated the Neighborhood Plan "clearly provides that the Property was to be a Neighborhood Center with some commercial development to meet the demand for basic services created by the walking community and youth athletic facility." The District Court thus concluded

12

Ordinance 18-23 "substantially complied with the growth policy and accordingly was not in the nature of special legislation." Further, it noted that it had found no opinions of this Court "since the establishment of the *Little* framework where a zoning decision that complied with a neighborhood plan/comprehensive plan/master plan was found to be spot zoning."

¶18     Hartshorne argues that the District Court erroneously applied the *Little* framework, which they contend courts must apply flexibly. They argue that Ordinance 18-23 constitutes impermissible spot zoning because it allows for commercial use in an area where the prevailing use is residential, Area 2(c) is small, and the ordinance benefits a single landowner at the expense of the surrounding landowners and the general public. Hartshorne contends the public comment on Ordinance 18-23 demonstrates that it was adopted at the expense of the public. They also contend that the ordinance does not substantially comply with the Neighborhood Plan because it allows for incompatible uses through a CUP rather than a PUD and because it permits IO2.5 to develop Area 2(c) with one hundred percent commercial use rather than the ten percent set forth in the Neighborhood Plan.

¶19     Growth policies, including neighborhood plans, must be a guiding policy for development in municipal zoning. *See* §§ 76-1-605(1)(c), 76-2-304(1)(a), MCA; § 11-2-3(B)(4), WCC (a neighborhood plan "shall serve as a specific guide to future land use regulations for the area" and "may limit or otherwise establish more restrictive land use regulations than set forth by the zoning classification of this title, in which case the more restrictive provisions of the plan shall control"); *see also Heffernan v. Missoula City*

*Council*, 2011 MT 91, ¶ 79, 360 Mont. 207, 255 P.3d 80 ("a governing body must substantially comply with its growth policy in making zoning decisions"). Compliance with such growth plans "is especially relevant to the third factor of the [*Little*] analysis." *Helena Sand & Gravel, Inc. v. Lewis & Clark Cty. Planning & Zoning Comm'n*, 2012 MT 272, ¶ 31, 367 Mont. 130, 290 P.3d 691 (citation omitted). "The zoning is not 'in the nature of special legislation' if it substantially complies with the growth policy." *Helena Sand & Gravel*, ¶ 31.

¶20 The District Court properly applied the three-part *Little* framework and did not err in rejecting Hartshorne's claim of spot zoning. True, as commercial uses, the conditional uses differ from the prevailing residential use in the area. But the Neighborhood Plan—adopted well before Ordinance 18-23—specifically contemplated "commercial uses intended to be complimentary to the proposed development of the neighborhood." *Compare, e.g., Little*, 193 Mont. at 347, 631 P.2d at 1290 (where a parcel was rezoned to allow for a regional mall in an area that the growth policy recommended as a medium-density residential area where the prevailing use of the area was ninety-nine percent residential). Ordinance 18-23's permitted commercial uses thus were compatible with the Neighborhood Plan, weighing heavily against satisfaction of the second and third elements. Although the ordinance changed the discretionary review process from a PUD to a CUP, these planning tools are similar: both require public input and hearings in front of the Planning Board and City Council; and both require review of all proposed developments for neighborhood compatibility, adequate public infrastructure, mitigation of adverse impacts, and compliance with the growth policy. *See* §§ 11-7-8(J),

14

11-2S-8, WCC. We similarly find unpersuasive Hartshorne's argument that the ordinance does not substantially comply with the Neighborhood Plan because it permits IO2.5 to develop Area 2(c) with one hundred percent rather than ten percent commercial use. All proposed developments still must go through the CUP process, during which the City must review the proposal for compliance with the Neighborhood Plan; that plan allows only ten percent of the site to be developed for commercial use. Thus, to the extent compliance with the growth policies is relevant to the issue of spot zoning, we agree with the District Court that Ordinance 18-23 "substantially complied" with the goals, objectives, and recommendations of the Neighborhood Plan. *See Heffernan*, ¶¶ 78-79.

¶21 Considering the ordinance's compliance with the Neighborhood Plan, the District Court properly concluded the second and third *Little* elements were not met. Although Area 2(c) is a geographically small area, it is the same size as it was when the Neighborhood Plan designated it for mixed-use, before IO2.5 purchased it. Similarly, although IO2.5 owns the entirety of Area 2(c), "zone changes for property owned by one person are not always spot zoning pursuant to the *Little* test." *Helena Sand & Gravel*, ¶ 31 (quoting *Greater Yellowstone Coal., Inc. v. Bd. of Cty. Comm'rs of Gallatin Cty.*, 2001 MT 99, ¶ 27, 305 Mont. 232, 25 P.3d 168). The fact that Ordinance 18-23 benefits IO2.5 is not sufficient to show the ordinance was enacted for the purpose of benefitting IO2.5 or at the expense of the general public. *See, e.g., N. 93 Neighbors, Inc. v. Bd. of Cty. Comm'rs of Flathead Cty.*, 2006 MT 132, ¶ 70, 332 Mont. 327, 137 P.3d 557 (concluding that the zoning amendment's requested use complied with the growth policy and thus the landowner's sole ownership of the parcel did not indicate the zoning amendment was

15

adopted at the expense of the surrounding landowners or the general public). Though the record shows the public comments on the ordinance were largely opposed, this does not necessarily mean the ordinance would be at the expense of the public, particularly when the Neighborhood Plan allowed for commercial uses in the area from its inception. What the ordinance changed was the manner by which the City would review any such proposals. The record demonstrates the Planning Board and City Council considered the comments but found that "it will be in the best interests of the City of Whitefish, and its inhabitants, to . . . allow the applicants to utilize a [CUP] rather than a PUD to develop [Area 2(c)] . . . and to define uses[.]"

¶22 We thus affirm the District Court's ruling with respect to the spot zoning claim.

¶23 *2. Whether the District Court erred in ruling that Ordinance 18-23 violates the uniformity requirement of § 76-2-302(2), MCA.*

¶24 "For the purpose of promoting health, safety, morals, or the general welfare of the community," a "local city or town council or other legislative body may divide the municipality into districts . . . . Within the districts, it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land." Sections 76-2-301, 76-2-302(1), MCA. The "uniformity requirement" contained in § 76-2-302(2), MCA, provides: "All regulations must be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts." This model statutory provision ensures that all property owners are treated equally and that there is no improper discrimination or favoritism within one

16

district.  *See, e.g., Jachimek v. Superior Court*, 819 P.2d 487, 489 (Ariz. 1991) (citing *Bartsch v. Planning & Zoning Comm'n of Trumbull*, 506 A.2d 1093, 1095 (Conn. 1986)).

¶25　The uniformity requirement arises from traditional "Euclidian" zoning principles, which separate incompatible land uses by dividing an area geographically into districts and specifying uses for each district.  *See Citizens for a Better Flathead*, ¶ 35.  But as a response to the more traditional and rigid "Euclidian zoning", "float zoning" has emerged in Montana and other states to provide flexibility to zoning authorities.  *Citizens for a Better Flathead*, ¶¶ 32, 35.  "Unlike traditional zoning by mapped districts, a floating zone establishes a use classification in the zoning ordinance when adopted by a legislative body but the classification is not delineated on the zoning map until after a rezoning process[.]"  *Citizens for a Better Flathead*, ¶ 33 (citations omitted).  Zoning bodies implement floating zones through two steps: (1) they first pass zoning ordinances with specific zoning classifications for specific purposes, which are said to "float above the jurisdiction"; (2) they then apply the floating zone to a particular property through a map amendment, creating a geographic district.  *Citizens for a Better Flathead*, ¶ 34.

¶26　The City has implemented "float zoning" instead of traditional "Euclidian" zoning. The Whitefish City Code first identifies various "use districts," such as the WR-4 use district, each having a corresponding set of regulations.  Section 11-2-1, WCC.  These "use districts" are the "zoning classifications" that "float above" the zoning map.  "The locations and boundaries of the use districts are [then] established as they are shown on . . . the official zoning map of the city of Whitefish[.]"  Section 11-2-2, WCC.  The amendment of the zoning map constitutes the second step of the process.

17

¶27    Hartshorne argued in its complaint and summary judgment motion that Ordinance 18-23 violated the uniformity requirement by treating "the Developer's WR-4 zoned property differently than other WR-4 zoned property anywhere else in the City, and further treats the Developer's residential PUD zoned property differently than other Residential PUD zoned property anywhere else in the City."  The District Court agreed, concluding without elaboration that Ordinance 18-23 violates the uniformity requirement "to the extent that the Ordinance permits conditional uses (*e.g.*, clubs, restaurants, retail sales and service) which are not permitted by WR-4 zoning."  Citing *Oberson v. USDA*, 2007 MT 293, ¶ 26, 339 Mont. 519, 171 P.3d 715, the court concluded, however, that "[t]he offending uses are not necessary to the integrity of Ordinance 18-23 and do not appear to have been the sole inducement to its enactment"; it thus struck only the "uses that do not comport with a WR-4 zone" and allowed the remainder of the ordinance to stand.

¶28    IO2.5 contends that Ordinance 18-23 does not violate § 76-2-302(2), MCA's, uniformity requirement because Area 2(c) is its own zoning district and cannot be compared to other districts.  It maintains that the "use districts" the WCC identifies are zoning classifications rather than districts, the equivalent of the "floating zones" discussed in *Citizens for a Better Flathead*.  It argues that the "districts" described under § 76-2-302(2), MCA, are the geographical districts identified on the City's zoning map, rather than the "use district" zoning classifications.  IO2.5 concludes that it is only within one geographical district that uniformity is required, not within all zoning districts with the same zoning classification.  Based on this reasoning, IO2.5 argues that Ordinance 18-23

18

does not violate the uniformity requirement because Ordinance 18-23 made Area 2(c) its own zoning district on the map.

¶29 We interpret statutes and ordinances based upon their plain language. *State v. Kelm*, 2013 MT 115, ¶ 22, 370 Mont. 61, 300 P.3d 687; *see* § 1-2-101, MCA ("the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted"). Terms and words are intended to be understood in their ordinary sense, and this Court assumes a legislative body used particular words for a particular reason. *State v. Alpine Aviation, Inc.*, 2016 MT 283, ¶ 11, 385 Mont. 282, 384 P.3d 1035; *Great N. Utils. Co. v. Public Serv. Comm'n*, 88 Mont. 180, 206, 293 P. 294, 299 (1930).

¶30 We agree with IO2.5 that the plain language of § 76-2-302(2), MCA, requires uniformity within the individual geographic districts identified on the City's zoning map. Though Title 76, chapter 2, part 3, MCA, does not define the term "district," it discusses the concept of a "district" as an "area" with "boundaries" and a "shape." *See* §§ 76-2-302(1), 76-2-303, MCA. Similarly, it differentiates between "districts" and the "regulations" that may be applied to those districts. *See, e.g.,* § 76-2-304, MCA. Construing the language of § 76-2-302, MCA, in the context of the statute and the statutory scheme as a whole, *see* §§ 1-2-101, -106, MCA, we conclude that the "use districts" in the WCC establish the applicable regulations or zoning classifications rather than the "districts" on the City's zoning map to which they are applied. The District Court thus erred by relying on the WR-4 use district classification, rather than a distinct geographic zoning area on the City's zoning map, to apply § 76-2-302(2), MCA, to Ordinance 18-23.

19

¶31    Because Ordinance 18-23 rezoned Area 2(c) with a different review process, different permitted uses, and its own map amendment, Area 2(c) now constitutes its own zoning district. As the regulations within Area 2(c) are applied uniformly, the District Court erred in its conclusion that Ordinance 18-23 violates § 76-2-302(2), MCA.[6]

¶32    We thus reverse the District Court's ruling striking the specified permitted uses not identified in the WR-4 classification.

## CONCLUSION

¶33    The City of Whitefish acted within its discretion in enacting Ordinance 18-23. The District Court correctly concluded that Ordinance 18-23 substantially complied with the Neighborhood Plan and that the second and third *Little* elements were not satisfied. We accordingly affirm the District Court's ruling with respect to Hartshorne's spot zoning claim. The City did not violate § 76-2-302(2), MCA, when it rezoned Area 2(c) to maintain IO2.5's opportunity to seek commercial development through a Conditional Use Permit after the Planned Unit Development process became unavailable. We accordingly reverse the District Court's ruling striking the portion of Ordinance 18-23 that specified additional conditional uses.

/S/ BETH BAKER

---

[6] To the extent Hartshorne and the District Court's ruling take issue with Ordinance 18-23's additional conditional uses that are not identified under the WR-4 regulations, this concern does not implicate § 76-2-302(2), MCA's, uniformity requirement. As discussed, the geographic districts identified on the City's zoning map are the "districts" within which § 76-2-302(2), MCA, requires uniformity. Through Ordinance 18-23's zoning map amendment, Area 2(c) constitutes its own district and the additional conditional uses applied within it are uniform. Whether those conditional uses comply with the WR-4 regulations or will be approved once IO2.5 submits a CUP application are separate questions, outside the purview of § 76-2-302(2), MCA.

20

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ LAURIE McKINNON